IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MU'AMMAR ALI,
ANTHONY THOMPSON,
VINCENT THOMPSON, and
JACOB WALLACE,

       Plaintiffs,

v.                                                                 CV 06-794 WPL

HAL CLAY MUMME, in his individual
capacity,

       Defendant.

**ORDER DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AGAINST JACOB WALLACE**

Mu'Ammar Ali, Anthony Thompson, Vincent Thompson, and Jacob Wallace are former members of the New Mexico State University football team. (Doc. 35 at 3.) Each plaintiff, an adherent to the Muslim faith, alleges that Hal Clay Mumme, the head coach of the NMSU football team, engaged in activities that violated the Plaintiffs' rights under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Mumme has filed a Motion for Summary Judgment against the claims of Jacob Wallace. (Doc. 63.) I conclude that genuine issues of material fact remain regarding Wallace's First and Fourteenth Amendment claims against Mumme. Accordingly, Mumme's Motion for Summary Judgment is denied.

BACKGROUND

**Mumme's Coaching Style**

Mumme became head coach of the NMSU football team in the spring of 2006. Mumme

brought to the NMSU football team "a new type of offense . . . called the 'Air Raid Offense,'" a strategy that strongly emphasized passing the football. (Doc. 68 at 12.) Plaintiffs allege that Mumme also brought to the team a strong emphasis on prayer and spirituality. Mumme, for example, often held a team-wide prayer after practice or before a game. (Doc. 79, Ex. B1, Mumme Dep. 149:11-18.) Christian themes, such as the Lord's Prayer and the Hail Mary, characterized these prayers. (*Id.* at 148:1-23; Doc. 73, Ex. W1, Wallace Dep. 64:24-25.) The prayers often ended with the words "in Jesus' name." (Doc. 64, Ex. A, Wallace Dep. 37:1-4.)  Mumme often asked a player to lead the prayer, but never asked a Muslim player to lead. (Doc. 73, Ex. W1, Wallace Dep. 64:20-65:11.) According to Plaintiffs, Mumme also said, "If you don't believe in God, I feel sorry for you." (Doc. 73, Ex. W1, Wallace Dep. 55:2-13.)

Plaintiffs further allege that Mumme used war rhetoric as part of his coaching style. (Doc. 73, Ex. W1, Wallace Dep. 47:17-48:3.) Plaintiffs allege that Mumme often sought to compel the NMSU players to join his support of the American military in Iraq and Afganistan. Mumme, for example, placed on each player's helmet his relative's infantry unit number in Iraq and gave the players "Freedom Bands" for the players to wear. (Doc. 73, Ex. W1, Wallace Dep. 40:2-24; Doc. 35 at 4, ¶ 30; Doc 44 at 2, ¶ 5.)

Plaintiffs contend that the "recitation of the Lord's Prayer and the consistent use of war rhetoric and support for the war in two Islamic nations made the Plaintiffs feel like outcasts . . . ." (Doc. 35 at 4, ¶ 31.) In response, Plaintiffs chose to pray separately and in accordance with their Islamic faith. (*Id.*; Doc. 44 at 3, ¶ 11.) Plaintiffs allege that "[s]everal players expressed concern that the Plaintiffs were praying separately and complained to the coaching staff." (Doc. 35 at 4, ¶ 32.) According to Plaintiffs, after learning that they were Muslim, Mumme's "treatment of them changed

dramatically." (Doc. 35 at 4, ¶ 33.)

### Facts Underlying Jacob Wallace's Claim

Jacob Wallace began attending NMSU while Tony Samuel was head coach of the football team. (Doc. 64, Ex. A, Wallace Dep. 17:12-13.) Prior to attending NMSU, Wallace attended Fresno State from 2001 to 2003. (*Id.* at 15:1-12.) During Wallace's freshman year at Fresno State (2001-2002), he was eligible to practice but not to play. (*Id.* at 14:17-25.) During Wallace's second year at Fresno State (2002-2003) he was eligible to both practice and play, but he did not play in any games at Fresno state. (*Id.* at 15:13-19.) Under Tony Samuel, Wallace was eligible to practice but not to play in games. (*Id.* at 17:24-25.) Mumme became head coach at NMSU at the start of Wallace's last year of eligibility. (*Id.* at 18:15-17.) Under Mumme, Wallace, who converted to Islam in July of 2005, participated in the fall football camp in 2005 and played in all twelve regular season games as a special teams player. (*Id.* at 19:1-18, 20:19-25.)

### DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court examines the record and draws all factual inferences in a light most favorable to the nonmoving party. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

If the moving party meets this initial burden, "it falls to the [nonmovant] to 'identify specific facts that show the existence of a genuine issue of material fact.'" *Munoz*, 221 F.3d at 1164 (quoting *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995)). "To avoid summary judgment, the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case." *Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). Summary judgment will "be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial." *Viernes v. Executive Mortgage, Inc.*, 372 F. Supp. 2d 576, 579 (D. Haw. 2004). In demonstrating the existence of a genuine issue of material fact, the nonmovant may not rely on "the mere allegations or denials" asserted in the party's pleading. FED. R. CIV. P. 56(e). Rather, through affidavits, depositions, answers to interrogatories, or further affidavits, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.*

## Free Exercise Clause

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST., amend I. The Free Exercise Clause applies to the states through the Fourteenth Amendment's Due Process Clause. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "To prevail on his Free Exercise claim, [the plaintiff] must first show that a state action sufficiently burdened his exercise of religion." *Genas v. New York Dep't of Corr. Servs.*,

75 F.3d 825, 831 (2d. Cir. 1996). A plaintiff demonstrates that her exercise of "religion is burdened if the challenged action is coercive or compulsory in nature." *Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997).[1]

To satisfy his burden under Rule 56, Mumme, who will not carry the burden of proof at trial, need only point "out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Thom*, 353 F.3d at 851. Mumme contends that his actions did not burden Wallace's exercise of his religion. Mumme argues that Wallace "prayed as often as possible throughout the entire football season pursuant to his Muslim faith and in fact put himself in physical danger by fasting during Ramadan when he had to be taken off the field."[2] (Doc. 64 at 7.) Similarly, Mumme contends that although Wallace was "personally uncomfortable when other players or coaches would say the Lord's Prayer or pray at meals," he "would do his own prayer at that time."

---

[1] The Supreme Court's decision in *Employment Div. v. Smith* held that "the Free Exercise Clause is not offended by a generally applicable criminal law that burdens religious practice if the burden on religion is not the object of the law, but merely the 'incidental effect' of an otherwise valid provision." *Genas*, 75 F.3d at 831. *Smith* "creates a 'safe harbor' - if the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end." *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002). "By contrast, if a law that burdens a religious practice or belief is not neutral or generally applicable, . . . 'the burdens on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest.'" *Axson-Flynn*, 356 F.3d at 1294 (quoting *Tenafly Eruv Ass'n., Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002)). Where a law or policy is not within *Smith's* safe-harbor, a plaintiff, to sustain a Free Exercise claim, must "show that a state action sufficiently burdened his exercise of religion." *Genas*, 75 F.3d at 831.

[2] Mumme claims that Wallace fails "to allege that defendant Mumme's actions would 'chill a person of ordinary firmness' from continuing their religious practices, and such a failure to do so warrants dismissal in and of itself." (Doc. 64 at 7.) In support of this argument Mumme relies on *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000). Mumme's reliance on *Worrell* appears misplaced. As Wallace points out in his Response, "The standard set forth in *Worrell* and the other cited authorities, which focuses on free speech, is not strongly dissimilar to the Free Exercise standard, except that 'coercive effect' supplants 'chilling effect' and free speech generally does not as consistently command the highest 'preferred position' as freedom of religion."(Doc. 73 at 8 n.1.) Mumme's Reply does not object to Wallace's use of the "coercive effect" standard and does not seek to reassert the *Worrell* analysis. (Doc. 77 at 3.) Accordingly, for purposes of this decision, I will analyze Wallace's Free Exercise clause claim without reference to the *Worrell* test.

(Doc. 64 at 7.) Moreover, Mumme points out that Wallace stated in his deposition that he "prayed as often as possible." (Doc. 64, Ex. A, Wallace Dep. 35:9.) According to Mumme, such actions demonstrate that Wallace lacks evidence necessary to prove the coercive effect of Mumme's actions on Wallace's exercise of his religious beliefs. (Doc. 77 at 3-4.) Accordingly, Mumme has satisfied his burden under Rule 56 by pointing "out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Thom*, 353 F.3d at 851.

Because Mumme satisfied his Rule 56 burden, Wallace must identify facts sufficient to create a genuine issue of material fact regarding whether Mumme's actions had a coercive effect on Wallace's exercise of his religious beliefs and thus imposed a substantial burden on Wallace's exercise of his religion. *Bauchman*, 132 F.3d at 557; *see also Shrum*, 449 F.3d at 1145 ("Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral . . . but the Free Exercise Clause is not confined to actions based on animus."). Wallace identifies several facts from which a factfinder could infer that Mumme's actions had a coercive effect on Wallace's exercise of religion. First, Wallace identifies evidence that demonstrates the existence of a genuine issue of material fact regarding the following essential elements in Wallace's claim against Mumme: 1) whether Mumme engaged in actions, and encouraged an atmosphere, hostile to Wallace's practice of Islam and whether this hostile atmosphere had a coercive effect on Wallace's exercise of his religion; 2) whether Mumme instituted Christian-only prayers prior to practice and meals and prohibited Muslims from leading with Muslim prayers and whether these actions had a coercive effect on Wallace's exercise of his religious beliefs; and 3) whether Mumme maintained food policies that disregarded Wallace's religious dietary restrictions and whether this action had a coercive effect on Wallace's exercise of his religious beliefs.

*Factual Issues Exist Regarding Whether Mumme*
*Encouraged an Atmosphere Hostile to Islam*

Wallace identifies several facts that create a genuine issue of material fact regarding whether Mumme encouraged hostility toward Islam and whether this hostility had a coercive effect on Wallace's exercise of his Islamic faith. (Doc. 73 at 14.) As evidence of Mumme's hostility toward Islam, Wallace points to Stevelan Harper's affidavit in which Harper, a former team member, stated that he "heard [Mumme] make a comment to Mu'Ammar Ali on the practice field in which he asked Mu'Ammar Ali whether he was involved with Al-Qaeda or whether he had anything to do with the war in Iraq." (Doc. 72, Ex. 17, at ¶ 7; Doc. 78.)[3] Additionally, Wallace points to a brief exchange between himself and Mumme. Wallace passed out while at a practice during the Muslim holy month of Ramadan, which Muslims observe by fasting from sunrise to sunset. (Doc. 64, Ex. A, Wallace Dep. 33:20-34:3.) Mumme, upon hearing the presumed cause of Wallace's fatigue, smirked and said "oh." (*Id.*) Mumme then drove off on his golf cart. (*Id.*) Wallace similarly contends that Mumme's use of war rhetoric, his requirement that players wear Mumme's relative's infantry number on their helmets, his instruction that the players wear "freedom bands" on their wrists, and his use of team fundraising to support individuals wounded in the Iraq war, when coupled with allegations that Mumme equated Al Qaeda with Islam, could potentially reflect Mumme's hostility toward Wallace's religion and

---

[3] The parties refer on several occasions to exhibits attached to documents related to Mumme's Motion for Summary Judgment against the claims of Ali and Anthony and Vincent Thompson. Such exhibits may be considered for purposes of Mumme's Motion for Summary Judgment against Wallace's claims. *See Stanko v. Maher*, 419 F.3d 1107, 1114 n.7 (10th Cir. 2005); *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 ("An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed. Thus, an affidavit submitted to support another motion may be taken into account on a motion for summary judgment.").

encourage his staff and players' anti-Muslim animus.[4]

Wallace also points to several statements from assistant coaches to support his argument that Mumme encouraged an atmosphere hostile to Wallace's exercise of his Muslim faith.[5] First, Wallace points out that shortly after Mu'Ammar Ali's removal, Assistant Coach Widenhofer "proposed at a team practice that AmuAmmar [sic] should lead the prayer or words to that effect." (Doc. 73 at 5, ¶ 36.) In his deposition, Widenhofer admits to saying "why don't you let Mu'Ammar say a prayer . . . ." (Doc. 72, Ex. 11, Widenhofer Dep. 38:22-39:13.) Second, Wallace points out that Assistant Coach Wilson spoke with him regarding the origins of Islam and Christianity. Wallace alleges that Wilson told Wallace "why [Wallace] should believe in Jesus." (Doc. 73, Ex. W1, Wallace Dep. 31:24-32:1-10; Doc. 72, Ex. 12, Wilson Dep. 135:15-136:10.) In his deposition, Wallace recounted that Wilson's questions put him in the "uncomfortable" position of defending his faith on the practice field. (Doc. 73, Ex. W1, Wallace Dep. 31:17-21.) Third, Wallace alleges that Assistant Coach Widenhofer mocked Wallace's Islamic faith when Widenhofer, knowing Islam forbids the consumption of pork, "offered Jacob Wallace a ham sandwich." (Doc. 73, Ex. W1, Wallace Dep. 42:21-43:7, 106:10-107:3.) Such facts demonstrate the existence of genuine issues of material fact regarding whether Mumme exhibited hostility toward Islam or encouraged an atmosphere hostile to Islam and whether

---

[4] My construction of Plaintiffs' allegations regarding Mumme's war rhetoric should in no way be construed as an indication that support for the wars in Iraq and Afganistan constitutes a violation of the Free Exercise Clause or indicates the presence of anti-Muslim animus. Such evidence, however, when viewed in light of Mumme's statements equating Islam and Al-Qaeda and Mumme's institution of a Christian-oriented team prayer, demonstrate the existence of genuine issues of material fact underlying Wallace's Free Exercise claim.

[5] In the Tenth Circuit, "a supervisor is not liable under § 1983 for the actions of a subordinate unless an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation or his failure to supervise." *Grimsley v. Mackay*, 93 F.3d 676, 679 (10th Cir. 1996). Wallace does not appear to contend that the assistant coaches' statements give rise to Mumme's liability under § 1983. Rather, Wallace appears to contend that Mumme's actions and hostility toward Islam encouraged similar hostility among the assistant coaches.

such hostility had a coercive effect on Wallace's exercise of his religious beliefs.

*Genuine Issues of Material Fact Exist Regarding Whether Mumme*
*Instituted an Exclusively Christian Prayer that had a Coercive*
*Effect on Wallace's Exercise of his Islamic Faith*

Wallace contends that the Christian-oriented prayer scheme instituted by Mumme "supports [Wallace's] Free Exercise claim by underscoring the exclusionary and isolative effect" on Wallace. (Doc. 73 at 15.) Wallace identifies two facts supporting this claim. First, Wallace points out that Mumme denied the Thompson twins' request to lead the team in a Muslim prayer. (Doc. 72, Ex. 2 at 3.) Moreover, Wallace's deposition, in which Wallace stated, "It was just kind of like, Unless you know The Lord's Prayer or the Hail Mary . . . it was kind of like you were kind of excluded from it," provides additional evidence for the exclusionary, Christian-oriented nature of the team prayers. (Doc. 73, Ex. W1, Wallace Dep. 65:8-11.) Second, Wallace points out that during the prayers, other individuals on the team looked oddly at those praying in the Muslim tradition. (*Id.* at 37:1-4.) Moreover, Wallace stated that the Christian-oriented prayers "negate[d]" his own prayers. (*Id.*) Such facts demonstrate the existence of a genuine issue of material fact regarding whether the presence of an exclusively Christian prayer, along with the coaching staff's disapproval of those praying in the Muslim tradition, had a coercive effect on Wallace's exercise of his Muslim faith.

Mumme contends that the non-mandatory character of the team prayers renders Wallace's Free Exercise claims meritless. Mumme, citing *Bauchman*, 132 F.3d 542, contends that to support a Free Exercise claim, a person must "show that they were actually coerced or pressured into violating a religious belief or tenet contrary to their religious practice." (Doc. 77 at 6.) Contrary to Mumme's argument, however, genuine issues of material fact exist regarding whether the Christian-oriented prayers "pressured" Wallace "into violating a religious belief or tenet" of his religion. (*Id.*)

9

Wallace alleges that as he prayed in the Muslim tradition, other players and coaches looked at him with disapproval. Moreover, Wallace states that the team's closing of a prayer with the words "in Jesus' name" would "negate" Wallace's prayer. (Doc. 64, Ex. A, Wallace Dep. 37:1-4.) Accordingly, genuine issues of material fact exist regarding whether such disapproval, combined with the exclusively Christian content of the prayers, the allegations concerning Mumme's hostility to Islam, and Wallace's belief that the words "in Jesus' name" negated his own prayer, exerted coercive pressure on Wallace to violate a tenet of his religious belief. *Cf. Bauchman*, 132 F.3d at 557 ("We conclude the fact Ms. Bauchman had a choice whether or not to sing songs she believed infringed upon her exercise of religious freedom, with no adverse impact on her academic record, negates the element of coercion and therefore defeats her Free Exercise claim.").

Mumme's argument also rests on the premise that the burden placed on Wallace's Free Exercise rights "should be ignored because he overcame that burden" and continued to adhere to the tenets of Islam. *Makin v. Colorado Dep't of Corr.*, 183 F.3d 1205, 1212-13 (10th Cir. 1999). As the Tenth Circuit observed in *Makin*, such an argument would "make[] the question of the legitimacy of government action dependent on the personal strength of the individual affected." *Id.* Accordingly, Wallace's persistence in observing his Muslim faith does not render harmless actions that would otherwise be constitutionally suspect.

*Genuine Issues of Material Fact Exist Regarding Whether Mumme Refused
to Incorporate Sufficient Food Alternatives and Whether Such Refusal
Violated Wallace's Rights Under the Free Exercise Clause*

Wallace identifies facts that demonstrate the existence of genuine issues of material fact regarding whether Mumme maintained food policies that disregarded Wallace's religious dietary restrictions and whether such action had a coercive effect on Wallace's exercise of his religious

beliefs. *See LeFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir. 1991) (the Free Exercise Clause protects an individual's genuine and sincere belief in religious dietary practices). Wallace points to several instances exhibiting the team's failure to incorporate sufficient food alternatives to accommodate Wallace's religious beliefs. (Doc. 73 at 6.) For example, Wallace points out that he notified Amber Thomas that he was Muslim and that Thomas knew of Wallace's dietary restrictions. (Doc. 64, Ex. A, Wallace Dep. 103:3-12, 104:2-7.) This factual allegation demonstrates the existence of genuine issues of material fact regarding whether the team failed to accommodate Wallace's dietary restrictions, whether Mumme played a role in this failure, and whether such failure violated Wallace's rights under the Free Exercise Clause.

## Equal Protection Clause

"To state a Section 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment, plaintiff must show that defendant acted with the intent to discriminate against [the plaintiff] because of his membership in a protected class."[6] *Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1303-04 (D. Kan. 2006). Religious affiliation constitutes a protected class. *See Employment Div., Dep't of Human Res. of Oregon*, 494 U.S. at 886 n.3. ("Just as we subject to the most exacting scrutiny laws that make classifications based on race . . . so too we strictly scrutinize governmental classifications based on religion.").

According to Mumme, Wallace's equal protection claims focus on the fact that Wallace was

---

[6] Mumme contends that to sustain an equal protection claim, Wallace must demonstrate "that his alleged different treatment was a 'spiteful' effort by Coach Mumme for reasons wholly unrelated to any legitimate objective." (Doc. 64 at 8.) As Wallace points out in his Response, Mumme's Motion incorrectly applies "case law discussing 'class of one' equal protection claims, which are not at issue here." (Doc. 72 at 18.) Wallace argues that Mumme "acted with the intent to discriminate against [him] because of his [Muslim faith]." *Rubio ex rel. Z.R.*, 453 F. Supp. 2d at 1303-04.

not a starter on the team and that Wallace was not allowed to wear religious head gear. Mumme argues that Wallace's allegation that he was not a starter fails for two reasons. First, "Wallace admitted that he played in all twelve games of the regular season as a special teams player." (Doc. 64 at 8.) Second, Dawson Wilber, "referenced as also playing plaintiff's position, was significantly faster in the 40 yard dash than plaintiff Jacob Wallace." (Doc. 64 at 8.) Similarly, Mumme argues that Wallace's mere inability to wear religious headgear cannot support an equal protection claim because Wallace never informed Mumme, or any other coach, about the religious head gear. (Doc. 64 at 9.) Thus, according to Mumme, Wallace lacks evidence necessary to establish an essential element of his equal protection claim.

To carry his Rule 56 burden, Wallace relies on the arguments used to support his Free Exercise claim as support for his equal protection claim. Although Wallace fails to provide facts to support his argument, I conclude that the facts identified to support his Free Exercise claim demonstrate the existence of a genuine issue of material fact regarding his equal protection claim. For example, genuine issues of material fact exist regarding whether Mumme's actions led to the team's failure to accommodate Wallace's dietary restrictions and whether Mumme took such actions with an intent to discriminate against Wallace because of Wallace's membership in a protected class.

## CONCLUSION

Summary judgment "is a drastic remedy that should be granted only with caution." *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 926 (10th Cir. 1985). Summary Judgment is inappropriate in light of the factual issues that exist regarding Wallace's First and Fourteenth Amenmdent claims against Mumme. Accordingly, Mumme's Motion for Summary Judgment as to Wallace's claims is denied.

IT IS SO ORDERED.

_____
HONORABLE WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

13