## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MU'AMMAR ALI,
ANTHONY THOMPSON,
VINCENT THOMPSON, and
JACOB WALLACE

        Plaintiffs,

v.                                                              CV 06-794 WPL

HAL CLAY MUMME, in his individual
capacity,

        Defendant.


## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST CLAIMS OF MU'AMMAR ALI, ANTHONY THOMPSON AND VINCENT THOMPSON

Mu'Ammar Ali, Anthony Thompson, Vincent Thompson, and Jacob Wallace are former members of the New Mexico State University football team. (Doc. 35 at 3.) Each plaintiff, an adherent to the Muslim faith, alleges that Hal Clay Mumme, the head coach of the NMSU football team, engaged in activities that violated the Plaintiffs' rights under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Mumme filed for Summary Judgment against the claims of Mu'Ammar Ali, Anthony Thompson, and Vincent Thompson. (Doc. 67.) I conclude that genuine issues of material fact exist regarding essential elements underlying the claims of Ali and the Thompsons. Accordingly, Mumme's Motion for Summary Judgment is denied.

**BACKGROUND**

**Mumme's Coaching Style**

Mumme became head coach of the NMSU football team in the spring of 2005. (Doc. 68 at 1.) Mumme brought to the NMSU football team "a new type of offense . . . called the 'Air Raid Offense.'" (Doc. 68 at 12.) The Air Raid Offense strongly emphasized passing the football. (*Id.*) Plaintiffs allege that Mumme also brought to the team a strong emphasis on prayer and spirituality. Mumme, for example, often held a team-wide prayer after practices and before games. (Doc. 79, Ex. B-1, Mumme Dep. 149:11-18.) Christian themes, such as the Lord's Prayer and the Hail Mary, characterized these prayers. (*Id.* at 148:1-23; Doc. 73, Ex. W-1, Wallace Dep. 64:24-25.)[1] Mumme often asked one of the players to lead the prayer, but never asked that a Muslim player lead the prayer. (Doc. 73, Ex. W-1, Wallace Dep. 64:20-65:11; Doc. 72, Ex. 10 at 4.) According to Plaintiffs, Mumme said "If you don't believe in God, I feel sorry for you." (Doc. 73, Ex. W1, Wallace Dep. 55:2-13.)

Plaintiffs also allege that Mumme used war rhetoric as part of his coaching style. (Doc. 72, Ex. 13, Wallace Dep. 47:17-48:3.) Plaintiffs allege that Mumme often sought to compel the NMSU players to join his support of the American troops in the wars in Iraq and Afganistan. (Doc. 72 at 12, ¶¶ 142-145.) Mumme, for example, placed on each player's helmet his relative's infantry unit number in Iraq. (Doc. 72 at 12, ¶ 142.) Mumme also provided "Freedom Bands" for the players to wear,

---

[1] For purposes of considering Mumme's Motion for Summary Judgment against the claims of Ali and the Thompsons, I have considered the exhibits attached to documents related to Mumme's Motion for Summary Judgment against Jacob Wallace's claims. *See Stanko v. Maher*, 419 F.3d 1107, 1114 n.7 (10th Cir. 2005); *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2722 ("An affidavit of a party that is on file in the case will be considered by the court regardless of the purpose for which it was prepared and filed. Thus, an affidavit submitted to support another motion may be taken into account on a motion for summary judgment.").

presumably as a form of support for the American military serving in Iraq and Afghanistan. (*Id.* at 13, ¶ 146.)

Plaintiffs contend that the "recitation of the Lord's Prayer and the consistent use of war rhetoric and support for the war in two Islamic nations made the Plaintiffs feel like outcasts . . . ." (Doc. 35 at 4, ¶ 31.) In response, Plaintiffs chose to "pray separately and in accordance with their Islamic faith." (*Id.*; Doc. 44 at 3, ¶ 11.) Plaintiffs allege that "[s]everal players expressed concern that the Plaintiffs were praying separately and complained to the coaching staff." (Doc. 35 at 4, ¶ 32.) According to Plaintiffs, after learning that they were Muslim, Mumme's "treatment of them changed dramatically." (Doc. 35 at 4, ¶ 33.)

### Facts Underlying Ali's Complaint

Ali joined the NMSU football team in 2003 and served as a tailback for the team from 2003 until his discharge from the team during the 2005-2006 season.[2] (Doc. 35 at 3.) Ali alleges that he left football camp in the summer of 2005 as the number one running back. (Doc. 68, Ex. E, Ali Dep. 128: 12-17.) Ali recalls that during a conversation with Mumme in July of 2005, Mumme told Ali that Ali would be a "big key factor" on the team. (*Id.* at 96:9-19.) During this same conversation, Mumme spent approximately 25 minutes questioning Ali regarding Islam's connection with Al Qaeda. (*Id.* at 97:10-98:14, 107:9-13.) According to Ali, he was "offended by the questions" and by the "ignorance" that drove Mumme to "ask right out of the blue about what is your connection to al-Qaeda." (*Id.* at 101:8-16.) Ali stated in his deposition that he "immediately [] knew [] that there was something wrong with" his conversation with Mumme. (*Id.* at 116:13-25.) Following this conversation, Mumme

---

[2] The parties appear to dispute whether or not Ali's association with the team began prior to 2003. (Doc. 35 at 3; Doc. 44 at 2.)

and Ali spoke at other times throughout the summer. (*Id.* at 117:10-11, 120:1-25.) Religious matters were not discussed in these subsequent conversations. (*Id.* at 120:12-14.) Stevelan Harper, a member of the NMSU team during the 2004-2005 season, stated in an affidavit that he heard Mumme "make a comment to [Ali] on the practice field in which [Mumme] asked [Ali] whether [Ali] was involved with Al-Qaeda or whether [Ali] had anything to do with the war in Iraq." (Doc. 72, Ex. 17, Harper Aff. ¶ 2, 7.)

NMSU played UTEP in the first game of the fall 2005 season. During this game, Ali fumbled and missed blocking assignments. (Doc. 68, Ex. E, Ali Dep. 134:22-135:15.) As a result of his poor performance, Mumme sent Ali down to practice with the scout team. (Doc. 68, Ex. B, Mumme Dep. 194:2-15.)

Approximately two weeks before the Fresno game, Mumme spoke with Ali and informed him that players on the team lacked confidence in his leadership abilities. (Doc. 68, Ex. E, Ali Dep. 147:12-17.) Mumme also told Ali that Mumme wanted "happy Mu'Ammar" back. (Doc. 72, Ex. 6, Mumme Dep. 232:7-10; Doc. 68, Ex. E, Ali Dep. at 147:2-6.) Mumme instructed Ali to begin practicing with the team on the Sunday prior to the Fresno game. (Doc. 72, Ex. 6, Mumme Dep. 232:16-22.) According to Ali, he attended the walk through practice on the Friday before the Fresno game. (Doc. 68, Ex. E, Ali Dep. 172:9-13). Wilson, in contrast, disputes Ali's version of events and claims that Ali did not attend the Friday walk through. (Doc. 72, Ex. 12, Wilson Dep. 121:9-18.) Ali did not attend the Saturday walk-through. (Doc. 68, Ex. E, Ali Dep. 172:14-17.) Ali states that he did not attend the Saturday walk through because he "did not stay in the hotel with the team and . . . was not verified onto meet up at the hotel for the walk through [sic]." (*Id.* at 172:19-21.) After missing the Saturday walk through, Coach Wilson called Ali. (*Id.* at 173:6-8.) Wilson appears to have

first told Ali to attend the team meal, but, after hearing of Ali's migraine problem, advised Ali to first "cater to [his] health." (*Id.* at 173:12-13, 174:1-4.)  According to Ali, Wilson promised to notify Mumme that Ali planned to miss the team meal. (*Id.* at 173:14-19). Ali then decided to attend the team meal. (*Id.* at 175:3-6.) Ali recalls that upon arriving at the team meal, Mumme instructed him to leave. (*Id.* at 176:3-14.) Ali received a phone call the day after the Fresno game informing Ali that Mumme had dismissed him from the team. (*Id.* at 179:1-6.)

### Facts Underlying Anthony Thompson and Vincent Thompson's Complaint

Anthony and Vincent Thompson began attending NMSU in the fall of 2003. Neither Thompson practiced during their first year with NMSU. Anthony did not practice during the spring and fall of 2004. (*Id.* at 15:18-16:13.) Anthony converted to Islam in October of 2004. (*Id.* at 22:18-19.)

Both Anthony and Vincent appear to have practiced with the team in the spring of 2005 but were not selected to attend summer camp. (Doc. 68, Ex. A, A. Thompson Dep. 15:18-16:7, 23:13-14, 36:21-37:1.) In his deposition, Anthony stated that he "did very well" during spring practices and was the starting receiver at the "exposition." (Doc. 68, Ex. A, A. Thompson Dep. 22:3-12.) Anthony alleges that despite being a "top receiver" on the team, his treatment on the team saw a dramatic change after the coaches learned of his Islamic faith. (Doc. 72, Ex. 10 at 5.) Shortly after the beginning of spring practice, Anthony Thompson, who was enrolled in a Women's Studies class at the University, engaged the Women's Studies professor in a discussion regarding "different cultures and their treatment of women." (*Id.* at 5.) The professor, appearing to have misunderstood Anthony's commentary regarding Islam and the treatment of women, relayed Anthony's comments to his coaches. (*Id.*) It was at this point that Anthony alleges his coaches became aware of his Muslim faith.

5

(*Id.*) Vincent alleges the coaches learned of his adherence to Islam at approximately the same time. (Doc. 68, Ex. C, V. Thompson Dep. 28:9-18.) After learning of his Islamic faith, Anthony alleges the coaches became dissatisfied with his actions, especially his refusal to participate in the team prayer. (Doc. 72, Ex. 10 at 4.) Vincent similarly alleges that after learning of his Muslim faith, the "whole attitude and atmosphere changed from one of praise to one of displeasure." (Doc. 72, Ex. 2 at 4-5.)

Following spring practice, neither Thompson was invited to participate in the summer training camp. (Doc. 68, Ex. A, A. Thompson Dep. 35:15-25; Doc. 72, Ex. 6, Mumme Dep. 123:9-12.) Mumme alleges that he permitted the Thompsons to rejoin the team as junior varsity players for the fall camp but instructed them to use the "officials" locker room.[3] (Doc. 72, Ex. 6, Mumme Dep. 171:13-22.) The specific rules, policies, and instructions regarding the Thompsons' use of the locker room remain unclear. (*Compare* Doc 68, Ex. C, V. Thompson Dep. 74:23-77:23; Doc. 72, Ex. 16, Sandoval Dep. 30:6-9; Doc 72, Ex. 6, Mumme Dep. 168:7-9, 171:5-25.) In August of 2005, Anthony and Vincent were terminated from the team for using the varsity locker room. (Doc. 72, Ex. 6, Mumme Dep. 182:13.)[4]

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV.

---

[3] The "officials" locker room is also referred to as the "JV" locker room.

[4] In his deposition, Mumme states that Anthony and Vincent "weren't necessarily released." (Doc. 72, Ex. 6, Mumme Dep. 182:14.) Rather, Mumme states that they "were told they could come back in January and try it again." (*Id.* 182:14-16.)

P. 56(c). The court examines the record and draws all factual inferences in a light most favorable to the nonmoving party. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

If the moving party meets this initial burden, "it falls to [the nonmovant] to 'identify specific facts that show the existence of a genuine issue of material fact.'" *Munoz*, 221 F.3d at 1164 (quoting *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995)). "To avoid summary judgment, the party opposing the motion must establish, at a minimum, an inference of the existence of each essential element to the case." *Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). Summary judgment will "be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial." *Viernes v. Executive Mortgage, Inc.*, 372 F. Supp. 2d 576, 579 (D. Haw. 2004). In demonstrating the existence of a genuine issue of material fact, the nonmovant may not rely on "the mere allegations or denials" asserted in the party's pleading. FED. R. CIV. P. 56(e). Rather, through affidavits, depositions, answers to interrogatories, or further affidavits, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.*

## Free Exercise Clause

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST., amend I. The Free Exercise Clause applies to the states through the Fourteenth Amendment's Due Process Clause. *Cantwell v. Connecticut*, 310 U.S. 296, 303-04

(1940). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "To prevail on his Free Exercise claim, [the plaintiff] must first show that a state action sufficiently burdened his exercise of religion." *Genas v. New York Dep't of Corrections*, 75 F.3d 825, 831 (2d. Cir. 1996). A state actor burdens a plaintiff's exercise of religion "if the challenged action is coercive or compulsory in nature." *Bauchman v. West High Sch.*, 132 F.3d 542, 557 (10th Cir. 1997).[5]

To satisfy his burden under Rule 56, Mumme, who will not carry the burden of proof at trial, need only point "out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Thom*, 353 F.3d at 851. Mumme's Motion satisfies this burden. Mumme argues that Plaintiffs lack specific evidence demonstrating that Mumme dismissed Plaintiffs because of their religious beliefs. In his Motion, Mumme contends that he dismissed Ali, along with several other players, "because it was clear that they didn't want to play for the Aggies and that they had poor attitudes and were not cooperating with the coaching staff." (Doc. 68 at 15.) Similarly, Mumme

---

[5] The Supreme Court's decision in *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872 (1990) held that "the Free Exercise Clause is not offended by a generally applicable criminal law that burdens religious practice if the burden on religion is not the object of the law, but merely the 'incidental effect' of an otherwise valid provision." *Genas*, 75 F.3d at 831. *Smith* merely "creates a 'safe harbor' - if the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end." *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002). "By contrast, if a law that burden a religious practice or belief is not neutral or generally applicable, it is subject to strict scrutiny, and 'the burdens on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling government interest.'" *Axson-Flynn*, 356 F.3d at 1294 (quoting *Tenafly Eruv Ass'n., Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002)). Where a law or policy is not neutral or generally applicable, and thus does not fall within *Smith's* safe-harbor, a plaintiff's Free Exercise claim turns on whether a law or policy imposes a substantial burden on the plaintiff's exercise of religion. *Shrum v. City of Coweta*, 449 F.3d 1132, 1145 (10th Cir. 2006); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963).

contends that Anthony and Vincent's decision to move their lockers prompted Mumme's decision to discharge them from the team. (Doc. 72, Ex. 6, Mumme Dep. 182:4-25.) Accordingly, Mumme's Motion satisfies his Rule 56 burden by pointing "out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Thom*, 353 F.3d at 851.

Because Mumme satisfied his Rule 56 burden, the burden shifts to Plaintiffs to point to specific facts that demonstrate the existence of a genuine issue of material fact. To sustain a free exercise claim, a plaintiff must demonstrate that the government imposed a substantial burden on the plaintiff's exercise of his religion. *See Bauchman*, 132 F.3d at 557. Plaintiffs contend that Mumme burdened their free exercise rights when Mumme discharged them from the team and when Mumme engaged in activities that had a coercive effect on the exercise of their religion. (Doc. 72 at 15-16.)

### Ali's Response

Ali identifies several facts that create a genuine issue of material fact regarding whether Mumme discharged Ali from the team because of Ali's exercise of Islam. Ali points out that Mumme's "disrespectful" questioning of Ali regarding the connection between Islam and Al-Qaeda creates a genuine issue of material fact regarding whether Mumme discharged Ali from the team because of Ali's exercise of Islam. (Doc. 72, Ex. 4, Ali Dep. 97:25-98:2; Doc 72, Ex. 12, Wilson Dep. 69:8-19; Doc. 72, Ex. 17, Harper Aff. ¶ 7.) Ali also points out that the contrast between Ali's athletic abilities and Mumme's decisions to discharge Ali from the team demonstrates the existence of factual issues regarding Mumme's motivation for terminating Ali. (Doc. 72 at 12.) Finally, Ali points out that the contrast between Ali's discharge and Mumme's lenient punishment of non-Muslim players who arguably committed more serious infractions creates genuine factual issues regarding Mumme's decision to terminate Ali. (Doc. 72 at 6.) Such facts sufficiently raise a genuine issue of

9

material fact regarding whether Mumme's actions substantially burdened Ali's exercise of his religious beliefs. *See Shrum*, 449 F.3d at 1145 (denying summary judgment where a factual dispute existed regarding whether the plaintiff's "attempted exercise of his religious freedoms . . ., and Defendant's knowledge of that attempt, was a motivating factor in the actions taken against him"); *Genas*, 75 F.3d at 831 ("By alleging that he was terminated from a state job on account of his religious practices, [the plaintiff] has satisfied," for summary judgment purposes, the requirement of demonstrating a substantial burden); *cf. Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996) ("With regard to [the plaintiff], it appears he was denied a benefit (participation on the football team) because of his decision to tell his parents and school officials about the incident in the locker room.").

Ali also identifies sufficient evidence to create a genuine issue of material fact regarding whether Mumme's actions had a coercive effect on Ali's exercise of his religious beliefs. Ali alleges that he was "offended" by Mumme's questions regarding the relationship between Islam and Al-Qaeda. (Doc. 72, Ex. 4, Ali Dep. 101:8.) Moreover, Ali alleges that the team maintained food policies that disregarded Ali's religious dietary restrictions. (Doc. 72 at 12, ¶ 135; Doc. 72, Ex. 13, Wallace Dep. 44:9-21, 55:18-21; Doc 64, Ex. A, Wallace Dep. 64:8-21.) Such allegations, coupled with Christian-oriented prayers and the Muslim players' inability to lead these prayers, sufficiently demonstrate the existence of a genuine factual issue regarding whether Mumme's actions had a coercive effect on Ali's exercise of his religious beliefs.

### Anthony Thompson and Vincent Thompson's Response

Anthony and Vincent Thompson identify several facts that demonstrate the existence of a genuine issue of material fact regarding whether Mumme's actions substantially burdened the Thompsons' exercise of their religious beliefs. The Thompsons point to factual issues regarding

Mumme's purported reason for their termination. According to Mumme, he dismissed the Thompsons from the team because they had violated his rule by moving their equipment from the "JV" locker room to the "Varsity" locker room. (Doc. 72, Ex. 6, Mumme Dep. 182:4-19.) The Thompsons, however, allege that no rules existed regarding players' use of the locker room. In support of this allegation, the Thompsons point to Stevelan Harper's affidavit. There, Harper states that "[t]here were no locker room rules in place at the time [the Thompsons] were kicked off the team." (Doc. 72 at 21; Doc. 72, Ex. 17, Harper Aff. ¶ 6.) The Thompsons similarly point out that Louis Sandoval, the team equipment manager, never expressly prohibited their use of the varsity locker room. (Doc. 72 at 9; Doc. 72, Ex. 16, Sandoval Dep. 30:1-9.) Finally, Anthony Thompson provides in his deposition that he and Vincent merely took a shower in the "Varsity" locker and then returned, with their equipment, to the "JV" locker room. (Doc. 72, Ex. 3, A. Thompson Dep. 84:21-25.)

Mumme's discipline of other players similarly demonstrates the existence of factual issues regarding whether Mumme discharged the Thompsons because of their Muslim faith. According to the Thompsons, several players who committed serious legal infractions received comparatively benign punishment. (Doc. 72 at 6, ¶ 87.) One player, in particular, allegedly produced counterfeit concert tickets. (*Id.*) Mumme, who originally considered discharging the player, decided, after considering the player's remorsefulness, to merely suspend the player for two games. (Doc. 72, Ex. 6, Mumme Dep. 70:7-16.) Such reconsideration of a player's punishment contrasts sharply with Mumme's alleged treatment of the Thompsons. In his deposition, Anthony Thompson recalls that Mumme accused them of wrongdoing and promptly terminated them from the team. (Doc. 72, Ex. 10 at 2.) Mumme's prompt termination of the Thompsons conflicts with his unwillingness to mete out similar punishment for arguably more serious infractions. Mumme's contention that the difference

11

in treatment arises out of the difference between scholarship players and walk-on players fails to sufficiently resolve factual issues for purposes of summary judgment. Ali's termination from the team, for example, potentially demonstrates that the loss of a scholarship need not precede a scholarship player's dismissal. (Doc. 72, Ex. 6, Mumme Dep. 233:13.) Summary judgment is inappropriate in light of such conflicting evidence.

Similarly, the Thompsons' response identifies genuine issues of material fact regarding whether or not Mumme's actions had a coercive effect on the exercise of their religious beliefs. The Thompsons allege that Mumme refused their request to lead the team prayer. (Doc. 72, Ex. 2 at 3; Doc. 72, Ex. 10 at 4.) Similarly, the Thompsons point out that Anthony Thompson was not allowed to use his Muslim name with anything involving team media publications. (Doc. 72, Ex. 10 at 4.) Such facts, coupled with evidence that several coaches questioned why the Thompsons practiced Islam, demonstrate the existence of factual issues regarding whether Mumme's actions had a coercive effect on the Thompsons' exercise of their religious beliefs.

## Equal Protection Clause

"To state a Section 1983 claim for violation of the Equal Protection Clause of the Fourteenth Amendment, plaintiff must show that defendant acted with the intent to discriminate against [the plaintiff] because of his membership in a protected class."[6] *Rubio ex rel. Z.R. v. Turner Unified Sch. Dist. No. 202*, 453 F. Supp. 2d 1295, 1303-04 (D.Kan. 2006). Religious affiliation constitutes a protected class. *See Smith*, 494 U.S. at 886 n.3. ("Just as we subject to the most exacting scrutiny

---

[6] Mumme contends that to sustain an equal protection claim, Plaintiffs "must show that the discriminatory action was in essence spiteful and for reasons wholly unrelated to any legitimate objective of the actor." (Doc. 68 at 15.) Plaintiffs allege discrimination on the basis of their religious beliefs. To sustain such an Equal Protection claim, Plaintiffs must demonstrate that Mumme "acted with the intent to discriminate against [them] because of [their Muslim faith]." *Rubio ex rel. Z.R.*, 453 F. Supp. 2d at 1303-04.

laws that make classifications based on race . . . so too we strictly scrutinize governmental classifications based on religion . . . .").

In support of his Motion for Summary Judgment, Mumme contends that Plaintiffs' Equal Protection claim fails because Plaintiffs are unable to identify facts demonstrating that discriminatory intent motivated Mumme's decision to discharge them from the team. (Doc. 68 at 15-16.) Mumme's Motion, therefore, satisfies his burden under Rule 56 of pointing "out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Thom*, 353 F.3d at 851.

To satisfy their burden of identifying specific facts demonstrating the existence of a genuine issue of material fact regarding whether Mumme acted with the intent to discriminate against Plaintiffs because of their religious beliefs, Plaintiffs appear to incorporate the arguments presented in support of their Free Exercise claim. Plaintiffs contend that they "have established that genuine issues of disputed material facts exist as to disparate treatment Plaintiffs received and whether they were motivated by animus towards their religion." (Doc. 72 at 23.) I conclude that the facts identified to support Plaintiffs' Free Exercise claim demonstrate the existence of genuine issues of material fact regarding Plaintiffs' Equal Protection claim. For example, genuine issues of material fact exist regarding whether Mumme acted with an intent to discriminate against Plaintiffs because of their religious beliefs when Mumme terminated them from the team. Similarly, genuine issues of material fact exist regarding whether Mumme denied Plaintiffs' requests to lead the team prayer because of their membership in a protected class. Finally, genuine factual issues exist regarding whether Mumme's actions led to the team's failure to accommodate Plaintiffs' religious dietary restrictions and whether Mumme took such action with an intent to discriminate against Plaintiffs because of their membership in a protected class.

## CONCLUSION

Summary judgment "is a drastic remedy that should be granted only with caution." *McGill v. American Land & Exploration Co.*, 776 F.2d 923, 926 (10th Cir. 1985). Summary judgment is inappropriate in light of the factual issues that exist regarding Plaintiffs' First and Fourteenth Amenmdent claims against Mumme. Accordingly, Mumme's Motion for Summary Judgment as to the claims of Ali and the Thompsons is denied.

IT IS SO ORDERED.

_____
HONORABLE WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.

14